AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### District of Oregon

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.   3:25-mc-1029 |
| The premises located at 7757 Simnasho, Warm Springs, | ) | |
| Oregon 97761, more fully described in Attachment A | ) | |
| | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

The premises located at 7757 Simnasho, Warm Springs, Oregon 97761, more fully described in Attachment A,

located in the _____ District of _____ Oregon _____ , there is now concealed *(identify the person or describe the property to be seized)*:

The information and items set forth in Attachment B hereto.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sections 2252A(a) (1), (a)(2), and (a)(5)(B) | Transportation, distribution, and possession of child pornography |

The application is based on these facts:

See the attached affidavit of Special Agent Gary Phillips, Federal Bureau of Investigation.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
(By telephone)
*Applicant's signature*

Gary Phillips, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ Telephone at 11:39 _____ a.m./p.m.  *(specify reliable electronic means).*

Date:  September 11, 2025        _____
*Judge's signature*

City and state:  Portland, Oregon        Honorable Jeffrey J. Armistead, U.S. Magistrate Judge
*Printed name and title*

#1

**Attachment A**

**Premises to be Searched**

The premises to be searched are the residence located at 7757 Simnasho, Warm Springs, Oregon 97761, and digital devices in the residence.  The residence is described as a pink, two-story wood framed structure with dark pink trim, a white front door, and an attached two-car carport, as pictured below.



**ATTACHMENT B**

**Items to Be Seized**

The items to be searched for, seized, and examined, are those items on the Subject Premises described in Attachment A that are or contain contraband, or evidence, fruits, and instrumentalities of violations of 18 U.S. Code §§ 2252A(a)(1) – *Transportation of Child Pornography,* 2252A(a)(2) – *Distribution of Child Pornography*, and § 2252A(a)(5)(B) – *Possession of Child Pornography*.

1.      The items to be searched for, seized, and examined are as follows:

a.   Any and all records, documents, or materials, including correspondence, that pertain to the production, possession, receipt, transportation, or distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

b.   All originals and copies (physical or digital) of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

c.   Any and all motion pictures or digital video clips of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256; video recordings that are self-produced and pertain to sexually explicit images of minors; or video recordings of minors which may assist in the location of minor victims of child exploitation or child abuse.

d.   Any and all records, documents, or materials that include offers to transmit, through interstate commerce by any means (including by computer), any

visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

e.  Any and all records, documents, or materials relating to the production, reproduction, receipt, shipment, trades, purchases, or transactions of any kind involving the transmission, through interstate commerce (including by computer), of any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

f.  Any and all records, documents, or materials naming or identifying minors visually depicted while engaging in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

g.  Any records of Internet usage, including records containing screen names, usernames, and e-mail addresses, and identities assumed for the purposes of communication on the Internet. These records may include billing and subscriber records, chat room logs, and e-mail messages.

h.  Any records, documents, or materials referring or pertaining to communications with others, whether in person, by telephone, or online, for the purpose of producing, distributing, receiving, or transporting child pornography, including chat logs, call logs, address book or contact list entries, and digital images sent or received.

i.  Computers, storage media, or digital devices used as a means to commit the violations described above, including accessing and viewing child pornography.

j.  Any storage containers capable of storing the above-described items that are not readily accessible at the time of the execution of the warrant, to include safes, lockboxes, secure containers, or locked chests.

2.  As used in this attachment, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.  The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.  The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

3.  For any computer or storage medium whose seizure is otherwise authorized by this warrant and any computer, storage medium, or digital device that contains, or in which stored records or information that is otherwise called for by this warrant (hereinafter "Device"):

a.  Evidence of who used, owned, or controlled the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing, history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence.

b.  Evidence of software that would allow others to control the Device, such as viruses, Trojan horses, and other forms of malicious software, as well as

**Attachment B**                                                                                   **Page 3**

evidence of the presence or absence of security software designed to detect malicious software.

c.   Evidence of the lack of such malicious software.

d.   Evidence indicating how and when the Device was accessed or used to determine the chronological context of computer access, use, and events relating to the crime under investigation and to the Device user.

e.   Evidence indicating the Device user's state of mind as it relates to the crime under investigation.

f.   Evidence of the attachment to the Device of other storage devices or similar containers for electronic evidence.

g.   Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device.

h.   Evidence of the times the Device was used.

i.   Passwords, encryption keys, and other access devices that may be necessary to access the Device.

j.   Documentation and manuals that may be necessary to access the Device or to conduct a forensic examination of the Device.

k.   Records of or information about Internet Protocol addresses used by the Device.

l.   Records of or information about the Device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

m. Contextual information necessary to understand the evidence described in this attachment.

n. Routers, modems, and network equipment used to connect devices to the Internet.

4. Records, information, and items relating to violations of the statutes described above, including:

a. Records, information, and items relating to the occupancy or ownership of the Subject Premises, 7757 Simnasho, Warm Springs, Oregon 97761, including utility and telephone bills, mail envelopes, or addressed correspondence.

b. Records, information, and items relating to the ownership or use of computer equipment or devices found in the above residence, including sales receipts, bills for Internet access, and handwritten notes.

c. Records and information relating to the identity or location of the persons suspected of violating the statutes described above.

5. During the execution of the search of the Subject Premises described in Attachment A, law enforcement personnel are also specifically authorized to compel any persons located at the Subject Premises believed to have access to devices subject to seizure under the warrant provide biometric features, including pressing fingers or thumbs against the device or putting a face before the sensor, or any other security feature requiring biometric recognition, of any device subject to seizure under the warrant, for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

**Attachment B**                                                                                    **Page 5**

**Search Procedure**

6.     The search for data capable of being read, stored, or interpreted by a computer or storage device, may require authorities to employ techniques, including imaging any computer or storage media and computer-assisted scans and searches of the computers and storage media, that might expose many parts of the device to human inspection in order to determine whether it constitutes evidence as described by the warrant.

7.     The review of the Device will be performed within a reasonable amount of time not to exceed 365 days from the date of execution of the warrant.  If the government needs additional time to conduct this review, it may seek an extension of the time period from the Court within the original 365-day period from the date of execution of the warrant.  If the government needs additional time to complete this review, it may seek an extension from the Court.

8.     If, at the conclusion of the examination, law enforcement personnel determine that particular files or file folders on the Device or image do not contain any data falling within the scope of the warrant, they will not search or examine those files or folders further without authorization from the Court.  Law enforcement personnel may continue to examine files or data falling within the purview of the warrant, as well as data within the operating system, file system, software application, etc., relating to files or data that fall within the scope of the warrant, through the conclusion of the case.

9.     If an examination is conducted, and it is determined that the Device does not contain any data falling within the ambit of the warrant, the government will return the Device to its owner within a reasonable period of time following the search and will seal any image of the Device, absent further authorization from the Court.

**Attachment B**                                                                                                          **Page 6**

10.     If the Device contains evidence, fruits, contraband, or is an instrumentality of a crime, the government may retain the Device as evidence or to commence forfeiture proceedings against the Device and/or the data contained therein.

11.     The government will retain a forensic image of the Device for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody of data, refuting claims of fabricating, tampering, or destroying data, and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

STATE OF OREGON  )
         ) ss:     AFFIDAVIT OF GARY PHILLIPS
County of Multnomah  )

**Affidavit in Support of an Application for a Search Warrant**

 I, Gary Phillips, being duly sworn, do hereby depose and state as follows:

**Introduction and Agent Background**

 1.  I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been for approximately 17 years.   During my tenure with the FBI, I have participated in numerous investigations, during which I have, among other things: (a) conducted physical and electronic surveillance, (b) executed search warrants, and (c) reviewed and analyzed stored electronic conversations and records.

 2.  As part of my duties, I investigate violations of federal law, including the online exploitation of children, and including violations pertaining to the illegal production, transportation, receipt, distribution, and possession of child pornography, in violation of Title 18 U.S.C. §§ 2251 and 2252A.

 3.  I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing a search of the residence located at 7757 Simnasho, Warm Springs, Oregon 97761 (the "Subject Premises"), as described in Attachment A.   Based on the facts set forth in this affidavit, I have probable cause to believe someone at that address violated 18 U.S.C. §§ 2252A(a)(1), (a)(2), and (a)(5)(B) by knowingly and unlawfully transporting, distributing, and possessing child pornography (the "Target Offenses"), and that contraband and evidence, fruits, and instrumentalities of those offenses, as described in Attachment B, will be found therein.

4.      This affidavit is intended to show only that sufficient probable cause exists for the requested warrant and does not set forth all of my knowledge about this matter.   The facts set forth in this affidavit are based on information provided by the National Center for Missing and Exploited Children (NCMEC), my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

**Applicable Law**

5.      **18 U.S.C. § 2252A(a)(1)** makes it unlawful for any person to knowingly mail, transport, or ship child pornography using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce by any means, including by computer.

6.      **18 U.S.C. § 2252A(a)(2)** makes it unlawful for any person to knowingly receive or distribute any child pornography using any means or facility of interstate or foreign commerce, or that had been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer.

7.      **18 U.S.C. § 2252A(a)(5)(B)** makes it unlawful for any person to knowingly possess or access with intent to view any child pornography that had been mailed, shipped, or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that had been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer.

**Affidavit of Gary Phillips**                                                                                  **Page 2**

8.      The term "child pornography" is defined in 18 U.S.C. § 2256(8) as any visual depiction of a minor engaging in sexually explicit conduct.   The term "sexually explicit conduct" is defined in 18 U.S.C. § 2256(2) as actual or simulated sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; or the lascivious exhibition of the anus, genitals, or pubic area of any person.   The term "minor" is defined in 18 U.S.C. § 2256(1) as any person under the age of 18 years.

**Background on Digital Devices and Child Pornography**

9.      Based on my knowledge, training, and experience, digital devices such as computers, digital tablets, smartphones, and the like, serve four basic functions in connection with child pornography:   production, communication, distribution, and storage.

10.      Child pornographers can upload images or video clips directly from a digital camera to a computer.   Once uploaded, they can easily be edited, manipulated, copied, and distributed.   Paper photographs can be transferred to a computer-readable format and uploaded to a computer using a scanner.   Once uploaded, they too can easily be edited, manipulated, copied, and distributed.   A modem allows any computer to connect to another computer using a telephone, cable, or wireless connection.   Through the Internet, electronic contact can be made to literally millions of computers around the world.

11.      The computer's ability to store images in digital form makes it an ideal repository for child pornography.   The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at a very high resolution.   Images and videos of child pornography can also be stored on removable data storage media, such as external hard

**Affidavit of Gary Phillips**                                                    **Page 3**

drives, thumb drives, media cards, and the like, many of which are small and highly portable and are easily concealed, including on someone's person.

12.      The Internet affords collectors of child pornography several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion, including Internet Relay Chat, instant messaging programs, bulletin board services, e-mail, and "peer-to-peer" ("P2P") file sharing programs and networks.   Collectors and distributors of child pornography also use online resources such as "cloud" storage services to store and retrieve child pornography.   Such online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in a variety of formats.   A user can set up an online storage account from any computer with access to the Internet.   Evidence of such online storage of child pornography is often found on the user's computer.

13.      As with most digital technology, communications made from a computer are often saved or stored on that computer.   Storing this information can be intentional, for example, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in "bookmarked" files.   Digital information can also be retained unintentionally.   Traces of the path of an electronic communication may be automatically stored in many places, such as temporary files or ISP client software, among others.   In addition to electronic communications, a computer user's Internet activities generally leave traces in the computer's web cache and Internet history files.   Such information is often maintained indefinitely until overwritten by other data.

14.      I know based on my training and experience and based on conversations I have had with others who investigate child exploitation offenses, that people who have a sexual

**Affidavit of Gary Phillips**                                                                                    **Page 4**

interest in children, including persons who collect and trade in child pornography, often receive

sexual gratification from images and video clips depicting the sexual exploitation of children.

They may also use such images and videos to lower the inhibitions of children who they wish to

sexually abuse.   Such persons maintain their collections of child pornography in safe, secure,

and private locations, such as their residence, and on computers and digital storage media under

their direct control.   Such persons often maintain their collections, which are considered prized

possessions, for long periods of time, and prefer not to be without their collections for any

prolonged period of time.   In some recent cases, however, some persons with a sexual interest in

children have been found to download and delete child pornography on a cyclical and repetitive

basis, rather than storing a collection of child pornography indefinitely.

  15.  Importantly, evidence of such activity, including deleted child pornography, can

often be located on these individuals' computers and digital devices using forensic tools.

Indeed, the very nature of electronic storage means that evidence of the crime is often still

discoverable for extended periods of time even after the individual "deleted" it.

## Statement of Probable Cause

  16.  The National Center for Missing and Exploited Children ("NCMEC") is an

organization that, among other things, tracks missing and exploited children, and serves as a

repository for information about child pornography.   Companies that suspect child pornography

has been stored or transmitted on their systems can report that information to NCMEC in a

CyberTipLine ("CT") report.   To make such a report, an internet service provider ("ISP") can go

to an online portal that NCMEC has set up for the submission of these tips.   The ISP then can

provide to NCMEC information about the child exploitation activity it believes has occurred,

including the incident type, the incident time, any screen or usernames associated with the

activity, any IP address or port numbers it captured, as well as other information it may have collected in connection with the suspected criminal activity.   Other than the incident type and incident time, the remainder of the information the ISP provides is voluntary and undertaken at the initiative of the reporting ISP.   The ISP may and frequently does upload to NCMEC any suspected child pornography files it collected in connection with the activity.   The ISP may or may not independently view the content of the files it uploads.   NCMEC does not review the content of the uploaded files.   Using publicly available search tools, NCMEC then attempts to locate where the activity occurred based on the information the ISP provides such as IP addresses.   NCMEC then packages the information from the ISP along with any additional information it has, such as previous related Cyber Tips, and sends it to law enforcement in the jurisdiction where the activity is thought to have occurred.

17.     On or around June 26, 2025, I received information from the Jefferson County Sheriff's Office (JCSO) regarding two NCMEC CT reports (CT Reports 207757751 and 211574859), involving KIK usernames "biggiecheese908" and "biggiecheese909" (the "Subject Accounts").   JCSO's investigation determined that the IP address(es) associated with the two CTs resolved to the Warm Springs Indian Reservation, in Warm Springs, Oregon, which is outside of JCSO's jurisdiction.

18.     On or around July 18, 2025, I obtained copies of NCMEC CT 207757751 and 211574859 from the Internet Crimes Against Children (ICAC) Data System. The reports were received by NCMEC on or around March 17, 2025, and May 6, 2025, respectively.   KIK, an online messaging and file sharing provider, reported that the Subject Accounts had uploaded multiple files of possible child pornography to the KIK platform.   The CT Reports specified that KIK had viewed every file in the reports and described the file(s) in each account as Apparent

**Affidavit of Gary Phillips**                                                                 **Page 6**

Child Pornography, Child Unclothed, and/or CP (unconfirmed).   The two reports are discussed in more detail below.

## CyberTipLine Report 207757751

19.     NCMEC received CT Report 207757751 from KIK on or around March 17, 2025. In CT Report 207757751, KIK reported that the user "biggiecheese909" uploaded two files, one of which was described by KIK as apparent child pornography, on or about March 13, 2025, during a private chat message to another KIK user.   KIK also provided the subscriber information and IP logs for KIK user "biggiecheese909," which was included with CT Report 207757751.   A review of CT Report 207757751 and the information provided by KIK indicated the following:

a)  NCMEC CyberTipline Report Number: 207757751

b)  Incident Date/Time: 03-13-2025 04:04:12 UTC

c)  Incident IP Address: 174.204.200.18 (Port: 2838)

d)  Username: biggiecheese909

e)  Display Name: Idk ..

f)  ESP/User ID: biggiecheese909_8s2

g)  Email Address: idk273985@gmail.com (Verified)

h)  Login IP Address: 199.16.109.176, Port: 37344, Date: 03-12-2025 12:10:43 UTC

i)  Login IP Address: 199.16.109.176, Port: 38068, Date: 03-13-2025 14:49:37 UTC

j)  Login IP Address: 199.16.109.176, Port: 39102, Date: 03-14-2025 05:29:27 UTC

k)  Login IP Address: 199.16.109.176, Port: 46368, Date: 03-15-2025 03:17:00 UTC

l)  Login IP Address: 199.16.109.176, Port: 42582, Date: 03-16-2025 15:13:01 UTC

20.    On or around July 18, 2025, I reviewed the files provided by KIK and determined CT Report 207757751 contained one file which met the definition of child pornography.   The following is a description of that file as observed:

> a)  File 80cfecb7-22b3-4be8-818b-0db3b3255db7.mp4, with a reported MD5 hash value of dab620abe11e6f1e89391a5ec8e507fa, is a video file, approximately 34 seconds in length.   The video depicts what appears to be a nude prepubescent girl licking and inserting an erect penis into her mouth repeatedly.   At approximately 14 seconds into the video, the same nude prepubescent girl is shown laying on her back.   A hand can be seen inserting an erect penis into the girl's vagina.

### CyberTipline Report 211574859

21.    NCMEC received CT Report 211574859 from KIK on or around May 6, 2025. In CT Report 211574859, KIK reported that on or about March 13, 2025, KIK user "biggiecheese908" uploaded four files, one of which was described by KIK as apparent child pornography, two of which were described by KIK as child unclothed, and one of which was described by KIK as CP (unconfirmed), during a private chat message to another KIK user. KIK also provided the subscriber information and IP logs for KIK user "biggiecheese908," which was included with CT Report 211574859.   A review of CT Report 211574859 and the information provided by KIK indicated the following:

> a)  NCMEC CyberTipline Report Number: 211574859
>
> b)  Incident Date/Time: 04-28-2025 00:36:41 UTC
>
> c)  Incident IP Address: 148.163.177.114 (Port: 54996)
>
> d)  Username: biggiecheese908

    e)  Display Name: biggiecheese908

    f)  ESP/User ID: biggiecheese908_09m

    g)  Email Address: idkwtph5633@gmail.com

22.    On or around July 18, 2025, I reviewed the files provided by KIK and determined at least one file in CT Report 211574859 met the definition of child pornography.   The following is a description of that file as observed:

    a)  File 36631ef1-ebfe-4f16-9f62-d92895983680.mp4, with a reported MD5 hash value of 62553fbe28810a5fff24f73dd65b3b4e, is a video that is approximately one minute and 22 seconds in length.   It begins with the title "My paradise, deep inside an angel's little cunt," and cuts to what appears to be an adult male with an erect penis penetrating a small-framed individual. The small-framed individual's face and genitalia cannot be seen in the video. The male's hand can be seen placed on the lower back of the small-framed individual.   The man's hand covers nearly all of the small-framed individual's pelvis.   The size of the adult male's hand to the small-framed individual is consistent with the small-framed individual likely being a small child.   The adult male engages in penetrative intercourse with the small-framed individual for the majority of the video.   Near the end of the video, the adult male removes his penis and ejaculates on the buttocks of the small-framed individual.

23.    On or about June 30, 2025, I received and reviewed records from Verizon, by way of the Oregon Department of Justice (ODOJ), for Internet Protocol (IP) address 174.204.200.18

**Affidavit of Gary Phillips**                                **Page 9**

Port: 2838 on March 13, 2025, at 05:35:03 Coordinated Universal Time (UTC).   The subscriber

information provided by Verizon revealed the following information:

    a)  Subscriber Name: Esmeralda Lawson

    b)  Mailing Address: 2626 Juniper Street, P.O. Box 40, Warm Springs, Oregon 97761

    c)  Telephone Number: +1-541-460-2960

    d)  Residential Address: 7757 Simnasho, Warm Springs, Oregon 97761

    e)  IP address 174.204.200.18:2838 on 03/13/2025 at 05:35:03 UTC: MSISDN: +1-541-460-8597

    24.    On or around July 1, 2025, the FBI received subscriber records from Google for

the email accounts idk273985@gmail.com and idkwtph5633@gmail.com, which revealed the

following information:

Google Account ID: 411288077071

    a)  Name: Idk 102

    b)  Given Name: Idk

    c)  Family Name: 102

    d)  e-Mail: idk273985@gmail.com

    e)  Created on: 2021-05-15 07:25:09 Z

    f)  Last Updated Date: 2025-06-13 08:58:29 UTC

    g)  Google Pay Customer Display Name: mikeal craig

    h)  Google Pay Billing Administrative Area Name: OR

    i)  Google Pay Locality Name: WARM SPRINGS

Google Account ID: 140235673226:

    a)  Name: Mikeal Craig

**Affidavit of Gary Phillips**                                                      **Page  10**

    b)  Given Name: Mikeal

    c)  Family Name: Craig

    d)  e-Mail: idkwtph5633@gmail.com

25.    On or around July 1, 2025, the FBI received subscriber records from Warm Springs Telecom for the following IP addresses, which were previously provided by KIK as account login IP addresses for KIK account username "biggiecheese909" in CT 207757751:

    a)  IP Address 199.16.109.176, Port: 37344, Date: 03-12-2025 12:10:43 UTC

    b)  IP Address 199.16.109.176, Port: 38068, Date: 03-13-2025 14:49:37 UTC

    c)  IP Address: 199.16.109.176, Port: 39102, Date: 03-14-2025 05:29:27 UTC

    d)  IP Address: 199.16.109.176, Port: 46368, Date: 03-15-2025 03:17:00 UTC

    e)  IP Address: 199.16.109.176, Port: 42582, Date: 03-16-2025 15:13:01 UTC

    f)  Account Holder: Eric Craig

    g)  Address: 7757 Simtustus, Warm Springs, OR 97761

26.    On or around September 6, 2025, I searched the Confederated Tribes of The Warm Springs Reservation Enrollment Records, dated April 7, 2023, for Mikeal Craig, with the following results:

    a)  Name: Craig, Mikeal Devan

    b)  Date of Birth: XX/XX/2005

    c)  Enrollment Number: 5822

    d)  Address 1: c/o Esmeralda Lawson P O Box 220

    e)  Address 2: 7757 Simtustus Warm Springs OR 97761-0220

27.    In conversations with other FBI Special Agents with knowledge of the Warm Springs Indian Reservation, I learned that 7757 Simtustus, Warm Springs Oregon, and 7757 Simnasho, Warm Springs, Oregon, are in fact the same address.

**Search and Seizure of Electronic Devices**

28.    As described above and in Attachment B, the requested warrant would allow law enforcement personnel to search for contraband and evidence, fruits, and instrumentalities of the transportation, distribution, and possession of child pornography, which will entail searches of computers, cellular telephones, and other electronic data storage devices under Fed. R. Crim. P. 41(e)(2)(B).    I have probable cause to believe that contraband and evidence, fruits, and instrumentalities of those offenses will be stored on one or more digital devices because, based on my knowledge, training, and experience, I know:

a.    Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a digital device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost.   Even when files have been deleted, they can be recovered months or years later using forensic tools. When a person "deletes" a file on a digital device, the data contained in the file does not actually disappear; rather, that data remains on the digital device until it is overwritten by new data. Therefore, deleted files or remnants of deleted files may reside in free space or slack space – that is, in space on the digital device that is not currently being used by an active file – for long periods of time before they are overwritten.   In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

b.    Wholly apart from user-generated files, digital devices – in particular, internal hard drives – contain electronic evidence of how a digital device has been used, what it

**Affidavit of Gary Phillips**                                                              **Page  12**

has been used for, and who has used it.   This forensic evidence can take the form of operating

system configurations, artifacts from operating system or application operation, file system data

structures, and virtual memory "swap" or paging files.   Digital device users typically do not

erase or delete this evidence, because special software is typically required for that task.

However, it is technically possible to delete this information.

   c. Similarly, files that have been viewed via the Internet are sometimes

automatically downloaded into a temporary Internet directory or "cache."

  29. As further described in Attachment B, this application seeks permission to locate

not only computer files that might serve as direct evidence of the crimes described on the warrant

but also for forensic electronic evidence that establishes how digital devices were used, the

purpose of their use, who used them, and when.   I have probable cause to believe that this

forensic electronic evidence will be on any digital device in the Subject Premises, because, based

on my knowledge, training, and experience, I know:

   a. Data on the digital device can provide evidence of a file that was once on

the digital device but has since been deleted or edited, or of a deleted portion of a file (such as a

paragraph that has been deleted from a word processing file).   Virtual memory paging systems

can leave traces of information on the storage medium that show what tasks and processes were

recently active.   Web browsers, email programs, and chat programs store configuration

information on the digital device that can reveal information such as online nicknames and

passwords.   Operating systems can record additional information, such as the attachment of

peripherals, the attachment of USB flash storage devices or other external storage media, and the

times the digital device was in use.   Computer file systems can record information about the

dates files were created and the sequence in which they were created.

**Affidavit of Gary Phillips**        **Page  13**

b.      Forensic evidence on a digital device can also indicate who has used or controlled it.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.   For example, registry information, configuration files, user profiles, email, email address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time.   Further, forensic evidence on a digital device can show how and when it was accessed or used.   Such "timeline" information allows the forensic analyst and investigators to understand the chronological context of access to the digital device, its use, and events relating to the offense under investigation.   This timeline information may tend to either inculpate or exculpate the user of the digital device.   Last, forensic evidence on a digital device may provide relevant insight into the user's state of mind as it relates to the offense under investigation.   For example, information on a digital device may indicate the user's motive and intent to commit a crime (e.g., relevant web searches occurring before a crime indicating a plan to commit the same), consciousness of guilt (e.g., running a "wiping program" to destroy evidence on the digital device or password protecting or encrypting such evidence in an effort to conceal it from law enforcement), or knowledge that certain information is stored on a digital device (e.g., logs indicating that the incriminating information was accessed with a particular program).

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how digital devices were used, the purpose of their use, who used them, and when.

**Affidavit of Gary Phillips**                                                          **Page  14**

   d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.   While it is possible to specify in advance the records to be sought, electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.   Whether data stored on a digital device is evidence may depend on other information stored on the digital device and the application of knowledge about how a digital device behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e. Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a digital device.   For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

   f. I know that when an individual uses a digital device to commit an online child pornography offense, the individual's digital device will generally serve both as an instrumentality for committing the crime and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.   The digital device is also likely to be a storage medium for evidence of crime.   From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

**Affidavit of Gary Phillips**               **Page  15**

30.     In most cases, a thorough search of the premises for information that might be stored on a digital device often requires the seizure of the device and a later, off-site review consistent with the warrant.   In lieu of removing a digital device from the premises, it is sometimes possible to image or copy it.   Generally speaking, imaging is the taking of a complete electronic copy of the digital device's data, including all hidden sectors and deleted files.   Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the digital device and to prevent the loss of the data either from accidental or intentional destruction.   This is true because:

a.     Not all evidence takes the form of documents and files that can be easily viewed on site.   Analyzing evidence of how a digital device has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.   As explained above, because the warrant calls for forensic electronic evidence, it is highly likely that it will be necessary to thoroughly examine digital devices to obtain evidence.   Digital devices can store a large volume of information.   Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.     Records sought under this warrant could be stored in a variety of formats that may require off-site reviewing with specialized forensic tools.   Similarly, digital devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.   Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.   The vast array of hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises.   However, taking the digital device off-site and

**Affidavit of Gary Phillips**                                                              **Page  16**

reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

31.    Because several people share the Subject Premises as a residence, it is possible that the Subject Premises will contain digital devices that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.   If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those digital devices, the warrant applied for would permit the seizure and review of those items as well.

32.    Many modern digital data storage devices have biometric unlocking features that, when enabled, allow users to unlock the device using a fingerprint or facial recognition technology.   The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.   I seek this authority based on the following:

a.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.    If a device is equipped with a fingerprint scanner and the scanner is enabled, a user may unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can

**Affidavit of Gary Phillips**                                                                 **Page  17**

unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

      c.     If a device is equipped with a facial recognition feature and that feature is enabled, a user may unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."   During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

      d.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.   Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.   This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

      e.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.   These circumstances include: (1) the device has been turned off, restarted, or inactive; (2) the device has received a remote lock command; (3) too many unsuccessful attempts to

**Affidavit of Gary Phillips**                                                                                  **Page  18**

unlock the device via biometric authentication are made; (4) when too many hours have passed since the last time the device was unlocked; and (5) when the device has not been unlocked via biometric authentication for a period of time and the passcode or password has not been entered for a certain amount of time.   For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours.   Biometric features from other brands carry similar restrictions.   Thus, in the event law enforcement encounters a locked digital device, the opportunity to unlock the device via biometric authentication exists only for a short time.

       f.     As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock digital devices found during the search of the Premises are not known to law enforcement.   Since law enforcement personnel may not otherwise be able to access the data contained within the device(s), making use of biometric features may be necessary to the search authorized by the requested warrant.

       g.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.   However, in my training and experience, that person may not be the only user of the device whose physical characteristics will unlock the device via biometric authentication, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.   Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the

**Affidavit of Gary Phillips**                                                     **Page 19**

device.   Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner discussed above to attempt to identify the device's user(s) and unlock the device(s) via biometric authentication.

33.    I therefore request that the Court authorize law enforcement to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the Premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

**Nature of Examination**

34.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I apply would permit seizing, imaging, or otherwise copying digital devices that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the device or information consistent with the warrant.   The later review may require techniques, including computer-assisted scans of the entire device, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

35.    The review of seized devices will be performed within a reasonable amount of time not to exceed 365 days from the date of execution of the warrant.   If the government needs additional time to conduct this review, it may seek an extension of time from the Court within the original 365-day period from the date the warrant is executed.

**Affidavit of Gary Phillips**                                                                                     **Page  20**

36.     If, at the conclusion of the examination, law enforcement personnel determine that particular files or file folders on a device or image do not contain any data falling within the scope of the warrant, they will not search or examine those files or folders further without authorization from the Court.   Law enforcement personnel may continue to examine files or data falling within the purview of the warrant, as well as data within the operating system, file system, software application, etc., relating to files or data that fall within the scope of the warrant, through the conclusion of the case.

37.     If an examination is conducted, and it is determined that a device does not contain any data falling within the ambit of the warrant, the government will return the device to its owner within a reasonable period of time following the search and will seal any image of the device, absent further authorization from the Court.

38.     If a Device contains contraband, or is evidence, the fruit, or an instrumentality of a crime, the government may retain the device as evidence or to commence forfeiture proceedings against the device and/or the data contained therein.

39.     The government will retain a forensic image of a device for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody of data, refuting claims of fabricating, tampering with, or destroying data, and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

40.     The government has made no prior efforts in any judicial fora to obtain the evidence sought under the warrant.

**Affidavit of Gary Phillips**                                                                        **Page  21**

**Conclusion**

41.     Based on the foregoing, I have probable cause to believe that the Subject

Premises, described in Attachment A, contains contraband and evidence, fruits, and

instrumentalities of violations of Title 18, United States Code, Sections 2252A(a)(1), (a)(2), and

(a)(5)(B), as set forth in Attachment B.   I therefore request that the Court issue a warrant

authorizing a search of the Subject Premises described in Attachment A for the items listed in

Attachment B, and the seizure and examination of any such items found.

42.     Prior to being submitted to the Court, this affidavit, the accompanying

application, and the requested search warrant were all reviewed by Assistant United States

Attorney (AUSA) Gary Sussman, who advised me that in his opinion, the affidavit and

application are legally and factually sufficient to establish probable cause to support the issuance

of the requested warrant.

_(By telephone)_____
GARY PHILLIPS
Special Agent, FBI

Subscribed and sworn to before me telephonically pursuant to Fed. R. Crim. P. 4.1 this

11th    day of September 2025, at   11:39  a.m./p.m.

_____
HONORABLE JEFFREY J. ARMISTEAD
United States Magistrate Judge

**Affidavit of Gary Phillips**                                                    **Page  22**